1  DONALD AMAMGBO, ESQ.
   AMAMGBO & ASSOCIATES

2

3  7901 Oakport Street, Suite 4900
   Oakland, California 94621

4  Telephone:  (510) 615-6000
   Facsimile:  (510) 615-6025

5

6  REGINALD TERRELL, ESQ.
   THE TERRELL LAW GROUP

7  Post Office Box 13315, PMB #148
   Oakland, California 94661

8  Telephone:  (510) 237-9700
   Facsimile:  (510) 237-4616

9

10  Attorneys for Plaintiff

11

12

13  UNITED STATES DISTRICT COURT

14  NORTHERN DISTRICT OF CALIFORNIA

15

16  HAROLD'S AUTOBODY, on behalf of          No. **C09-03413**
    itself and on behalf of all others similar

17  situated,                                CIVIL - CLASS ACTION

18          Plaintiffs,                      JURY TRIAL DEMANDED

19      vs.

20  GENERA CORPORATION, a California
    corporation; MAXZONE VEHICLE

21  LIGHTING CORP., a California
    corporation; E-LITE AUTOMOTIVE, INC.,

22  a California corporation; BYC BROTHER
    INDUSTRIAL co., ltd., a Taiwanese

23  corporation; DEPO AUTO PARTS
    INDUSTRIAL CO., LTD., a Taiwanese

24  corporation; and EAGLE EYES TRAFFIC
    INDUSTRIAL CO., LTD., a Taiwanese

25  corporation.

26

27

28          Defendants

**I.    INTRODUCTION**



**FILED**

JUL 2 4 2009

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

**FILED**

September 8, 2009

by La'Ree Horn
CLERK U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
LOS ANGELES DIVISION

CV09-6381 GW (PJWx)

E-filing

ADR

-1-

1    1.    Plaintiff Harold's Auto body, Inc. ("Harold's) brings this action both individually
2  and on behalf of a Class of plaintiffs consisting of all persons and entities in the United States,
3  and its territories and possessions, who purchased directly from Defendants AALP, also known
4  as AM lights and AM lamps ("Aftermarket Automotive Lighting Products" or 'AALP") from
5  January 1, 2004 through the present (the "class period").

6    2.    Defendants are Taiwanese manufacturers of their domestic subsidiary distributors
7  that collectively sell hundreds of millions of dollars worth of AALP annually in the United
8  States.

9    3.    Plaintiff alleges that during the class period, Defendants conspired, combined and
10 contracted to fix, raise, maintain and stabilize prices at which AALP would be sold.  As a result
11 of Defendants' unlawful conduct, Plaintiff and other members of the proposed Class paid
12 artificially inflated prices that exceeded the amount they would have paid if a competitive market
13 had determined prices for AALP.

14    **II.    JURISDICTION AND VENUE**

15    4.    Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, (15 U.S.C.
16 §§ 15 and 26), to recover treble damages and costs of suit, including reasonable attorneys' fees,
17 against Defendants for the injuries sustained by Plaintiff and the class members by reason of the
18 violations of the Sherman Act (15 U.S.C. §1).

19    5.    This action is also instituted to secure injunctive relief against Defendants to
20 prevent them from further violations of Section 1 of the Sherman Act, as hereinafter alleged.

21    6.    Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by
22 Sections 4 and 16 of the Clayton Act, (15 U.S.C. §§ 15 and 26),

23    7.    Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15(a) and 22 and
24 28 U.S.C. § 1391(b), (c) and (d) because, during the class period, Defendants resided, transacted
25 business, were found, or had agents in this district, and a substantial portion of the affected
26 interstate trade and commerce described below has been carried out in this district.

27    8.    This Court has personal jurisdiction over each Defendant because, inter alia, each
28 defendant; (a) transacted business throughout the United States, including in this district; (b)

-2-

1  participated in the sale and distribution of AALP  throughout the United States, including this

2  district; (c) had substantial contacts with the United States, including in this district; and/or (d)

3  was engaged in an illegal scheme and price-fixing conspiracy that was directed at and had the

4  intended effect of causing injury to persons residing in, located in, or doing business throughout

5  the United States, including in this district.  Further jurisdiction al contacts are alleged below.

## III.  PLAINTIFF

7  9.  Plaintiff Harold's is a California business with its principal place of business

8  located in Alameda County, California.  During the class period, Harold purchased AALP

9  directly from one or more Defendants.  Because of the alleged conspiracy, plaintiff was injured in

10  its business and or property by reason of the antitrust violations alleged herein.

## IV.  DEFENDANTS

12  10.  As described in more detail herein, the Defendants are comprised of the following

13  three pairs of Taiwanese manufactures of AALP  and their subsidiary distributors based in the

14  United States: TYC / Genera; Depo / Maxzone; and Eagle Eyes / E-Lite.

15  11.  Defendant TYC Brother Industrial Co. Ltd. ("TYC") is a corporation organized

16  and existing under the laws of Taiwan with its principal place of business located at 72-2 Shin-

17  leh Road, Tainan, Taiwan 702.  TYC manufactures its products in Taiwan and exports the same

18  for sale around the world, including the United States.  TYC's website states that it "produces the

19  most comprehensive aftermarket lamp line in the industry, in addition to designing and

20  manufacturing Original Equipment Lamps for prominent well known vehicle manufactures in

21  North America, Europe, Asia Pacific, Middle East and Africa."  In 2003 and 2006, TYC

22  estimated that it accounted for about 70% of North America's auto-insurance auto-lamp

23  aftermarket sales.  TYC states that its most valued OEM customers includes but are not limited to

24  Visteon (North America and Asia Pacific), International Truck & Engine (North America) and

25  Suzki (Spain and North America).  During the class period, TYC sold AALP to class members in

26  the United States.

27  12.  Defendant Genera Corporation ("Genera") is a corporation organized and existing

28  under the laws of the State of California with its principal place of business located at 26

-3-

1 Centerpoint Drive, Suite 100, La Palma, California 90623. Genera imports, distributes and sells
2 throughout the United States AALP imported from Taiwan, generating $178 million annual sales.
3 Genera is a wholly or partially-owned subsidiary of defendant TYC and was formed by TYC in
4 1991 to be its sole and exclusive United States distributor. Genera further contends that it
5 "distributes [the] majority of its lighting, mirror, and heat exchanger products through a
6 nationwide network of warehouse distributors (WD's), who, in turn, market to collision body
7 shops and heating/cooling system specialists. In addition, jobber/retail locations represent a
8 growing channel of distribution for TYC products, including most product lines in Canada and
9 lighting products in the U.S."

10     13. Genera's products include automotive lamps and performance lamps. With
11 respect to automotive lamps, Genera states on its website the following with respect to its
12 aftermarket products manufactured by defendant TYC. "TYC offers the world's most
13 comprehensive automotive replacement lighting products available, ranging from domestic to
14 import applications, from passenger cars to SUVs. Quality is the hallmark of TYC products,
15 supported by TYC's reputation as a respected worldwide Original Equipment lamp supplier to
16 Ford Motor Company (through Visteon), International Truck, and Fleetwood Industries. Each
17 lamp meets or exceeds applicable DOT/SAE standards and complies with the U.S. Motor Vehicle
18 Safety Standard, FMVSS-108." With respect to performance lamps, Genera states that "Elegante
19 by TYC performance lamps allow individuals to express their unique personality without
20 sacrificing quality and legality. From stylish and distinct design headlamps to LED tail lamps,
21 TYC manufactures its Elegante brand of performance lamps that are far superior in fit and
22 quality, and also 100% compliant to SAE/DOT regulations and FMVSS-108. These performance
23 lamps' long-lasting brilliance, spectacular design, and durability are a result of high quality
24 materials, workmanship, and rigorous quality tests." On a related website devoted to its
25 performance lamps, Genera notes that they also are referred to as "altezzas" or "euro lights."

26     14. Genera's performance lamp products currently include tail lamps, backup lamps,
27 and headlamps, in multiple colors and paintable, for numerous makes and models of vehicles,
28 including Acura, Chrysler, Chevrolet, Dodge, Ford, GMC, Honda, Lincoln, Mercury, Mitsubishi,

-4-

1  Nissan, Pontiac, Saturn, Subaru, Toyota and Volkswagen. Genera lamps are listed as including
2  the following functionalities: tail, stop, turn signal, side marker, backup, and reflex. Genera
3  provides detailed testing reports via its performance lamp website that document compliance with
4  the photometric requirements of the U.S. Federal Motor Vehicle Safety Standard (FMVSS).
5  Genera notes on its performance lamp website that "[w]e currently do not sell Elegante by TYC
6  lamps to the public so all purchased must be through an authorized dealer, whether online or
7  retail location." During the class period, Genera sold AALP to Class members in the United
8  States.

9      15.    Defendant Depo Auto Parts Ind. Co., Ltd. ("Depo") is a corporation organized and
10  existing under the laws of Taiwan with its principal place of business located at 20-3, Nan Shih
11  Lane, Lu Kang, Chang-Hwa Hsien, Taiwan 638. Depo is a leading manufacturer of AALP which
12  it manufactures in Taiwan and exports for sale around the world including the United States.
13  Depo was formed in 1977 as Ming Yang Corp., and in 2002 was renamed Depo Auto Parts Ind.
14  Co., Ltd. In 2004, it was estimated that Depo accounted for about 35% of the American
15  aftermarket lamp market, trailing only defendant TYC. In 2004, Depo became a publicly-traded
16  company on the Taiwan Stock Exchange. Depo develops, manufactures, and distributes
17  replacement lamps for vehicles under its "Depo" and "Lucid" brands. During the class period,
18  Depo sold AALP to Class members in the United States.

19      16.    Defendant Maxzone Vehicle Lighting Corp. ("Maxzone") is a corporation
20  organized and existing under the laws of the State of California with its corporation organized
21  and existing under the laws of the state of California with its principal place of business located
22  at 11016 Mulberry Avenue, Suite B, Fontana, California 92337. Maxzone imports, distributes
23  and sells throughout the United States AALP imported from Taiwan. Maxzone is a wholly or
24  partially owned subsidiary of defendant Depo and was formed by Depo in 1997 to be its sole and
25  exclusive United States distributor. Maxzone's website states that "[a]ll our automotive lamp
26  products are designed, developed and produced by our parent company, DEPO Auto Parts Corp,
27  a world class manufacturer of automotive replacement lamps…DEPO has Maxzone to take care
28  of North America distribution and [the] Taipei business office to take responsibility for the sale

-5-

1  of Europe, Africa, South America and Australia area." Maxzone's website states that "[I]n
2  addition [to] our aftermarket auto lamps, our product lines include OEM lamps, performance
3  lamps, window regulator and door handle." Maxzone's products include replacement lights and
4  performance lights. Maxzone has four distribution centers, located in: Elmwood Park, NJ;
5  Atlanta, GA; Elgin, IL; and Etobicoke (Toronto), Canada. Maxzone's website further notes that
6  it "only sells wholesale." During the class period, Maxzone sold AALP to Class Members in the
7  United States.

8  17.    Defendant Eagle Eyes Traffic Ind. Co. Ltd. ("Eagle Eyes") is a corporation
9  organized and existing under the laws of Taiwan with its principal place of business located at
10 No. 27 Lane 764 Chung Shan N. Rd., Yung Kang City, Taiwan Hsien, Taiwan. Eagle Eyes is a
11 manufacturer of AALP which it manufactures in Taiwan and experts for sale around the world,
12 including the United States. Eagle Eyes was formed in 1979, and its website states that it
13 "devoted itself to the production of high quality automotive lamps, both spare and performance.
14 We serve global AM customers in nearly 100 countries.    This ISO 9001: 2000 certified
15 cooperation [*sic*] is confident with its ability to provide safety and fulfillment to its customer
16 consistently. In addition to our qualified spare products, we also design and produce stylish
17 performance lamps suppliers around the world." Eagle Eyes' products include replacement auto
18 lamps and performance lamps, including rear lamps, head lamps, signal lamps, fog lamps, park
19 lamps, side marker lamps, and corner lamps for numerous makes and modes of vehicles. During
20 the class period, Eagle Eyes sold AALP to class members in the United States.

21 18.    Defendant E-Lite Automotive Inc. ("E-Lite") is a corporation duly organized and
22 existing under the laws of the state of California with its principal place of business located at
23 14401 Monte Vista Avenue, Chino, California 91708. E-Lite imports, distributes and sells,
24 throughout the United States, AALP from Taiwan. E-Lite is a wholly or partially owned
25 subsidiary of defendant Eagle Eyes and was formed by Eagle Eyes in 2006 to be its sole and
26 exclusive United States distributor. E-Lite's website states that "E-Lite U.S.A. Automotive, a
27 partner of Eagle Eyes Corporation, was founded in 2006" and that "[a]ll of our lamps are made
28 by Eagle Eyes Corporation" and that '[w]e specialize in headlights, taillights, corner lights,

-6-

1 parking lights, and fog lights in the aftermarket lamps market." And that "E-Lite produces a wide

2 array of lamps intended for use in all major North American car manufacturers' products."

3 During the class period, E-Lite sold AALP to class members in the United States.

4      19.    Defendants TYC, Genera, Depo, Maxzone, Eagle Eyes and E-Lite are collectively

5 referred to herein as "Defendants".

6      20.    Whenever in this Complaint reference is made to any act, deed or transaction of

7 any corporation, the allegation means that the corporation engaged in the act, deed or transaction

8 by or through its officers, directors, agents, employees or representatives while they were actively

9 engaged in the management, direction, control or transaction of the corporation's business or

10 affairs.

11      21.    All acts alleged in this Complaint to have been done by Defendants were

12 performed by their officers, directors, agents, employees or representatives while engaged in the

13 management, direction, control or transaction of Defendants' business affair.

14                        **V.    CO-CONSPIRATORS**

15      22.    Various other persons, firms, corporations and entities have participated as

16 unnamed co-conspirators with Defendants in the violations and conspiracy alleged herein,

17 including but not limited to, Tong Yang Industrial Co., Ltd. ("Tong Yang"). In order to engage

18 in the offenses charged and violations alleged herein, these co-conspirators have performed acts

19 and made statements in furtherance of the antitrust violations and conspiracies alleged herein.

20      23.    At all relevant times, each defendant was an agent of each of the remaining

21 Defendants, and in doing the acts alleged herein, was acting within the course and scope of such

22 agency. Each defendant ratified and/or authorized the wrongful acts of each of the Defendants.

23 Defendants, and each of them, are individually sued as participants and as aiders and abettors in

24 the improper acts and transactions that are the subject of this action.

25                  **VI.    INTERSTATE TRADE AND COMMERCE**

26      24.    The business activities of Defendants that are the subject of this action were

27 within the flow of, and substantially affected, interstate trade and commerce.

28      25.    During the class period, Defendants sold substantial quantities of AALP in a

-7-

1 continuous and uninterrupted flow of interstate commerce to customers throughout the United
2 States.

## VII. THE MARKET FOR AALP

4   26.   As the demand for automotive repair parts grew in the 1950's and 1960's, non-
5 OEM parts manufacturers entered the market where independent mechanics, but not dealers,
6 purchased the parts. This is referred to as an aftermarket. As "aftermarket is the market for
7 replacement and supplementary parts and/or repair services for a product that the buyer has
8 previously acquired, or for products consumed through the use of the original product." AALP
9 constitute a market distinct from lighting products supplied by third parties to vehicle
10 manufacturers for incorporation into new vehicles and also distinct from the market for original
11 equipment replacement parts made b the manufactures of automobiles, or for those manufactures
12 by third parties. There is a significant difference in the wholesale price, often as large as 50%
13 between and OEM product and a comparable aftermarket product. In addition, most insurance
14 carriers who supply coverage for automobile collisions require automotive body shops to
15 purchase and use aftermarket products on repairs paid for by the insurance carriers. Accordingly,
16 aftermarket products and products of original equipment manufacturers are not reasonably
17 interchangeable substitutes from the point of view of the purchaser and are not in direct and
18 substantial competition with each other.

19   27.   Aftermarket prices are cheaper than OEM prices because aftermarket companies
20 specialize in such products and tend to redesign and make more cost efficient changes as
21 compared to the OEM product, resulting in cheaper prices.

22   28.   The so-called "crash-parts market" referring to those parts most often replaced
23 following collisions, is divided into two mains areas: (a) OEM parts, which are often distributed
24 through the auto manufactures' own service channels and sold under their brands, and (b)
25 aftermarket parts, which have the same specifications as OEM parts but are often without
26 automaker certification.

27   29.   With over 225 million vehicles in the United States, the automotive aftermarket
28 industry is substantial. Sales of aftermarket automotive products in the United States exceeded

-8-

COMPLAINT

1  $285 billion in 2007.

2      30.    AALP include, but are not limited to, headlamps and bulbs, parking, tail and
3  interior lights, spot lights, fog lights and auxiliary lights.

4      31.    The percentage of the entire aftermarket automotive products that is made up of
5  lighting products represents a significant amount of commerce, with approximately $450 million
6  sales in the United States in 2005, with projected growth to approximately $515 million to 2010.

7      32.    Collectively, the products of the manufacturing Defendants comprise the vast
8  majority of all AALP sold in the United States, and as a consequence, their importer-distributor
9  Defendant affiliates also control the vast majority of the Aftermarket Automotive Lighting
10  Product market in the United States.

11                          **VIII.   BARRIERS TO ENTRY**

12      33.    There are significant barriers to entry in the market for AALP that have facilitated
13  Defendants' collusion as described herein.  These include substantial research and development
14  costs, and the development and maintenance of a robust distribution system.  Two other factors
15  are of particular note here: (a) the need to obtain various quality certifications for aftermarket
16  products, and (b) the collusive business culture among Taiwanese manufacturers of aftermarket
17  automotive parts, including the manufacturer defendants.

18  **Quality Certifications**

19      34.    The Certified Automotive Parts Association ("CAPA") is a non-profit
20  organization established to develop and oversee a test program guaranteeing the suitability and
21  quality of automotive parts.  Its website states "CAPA encourages competition in the marketplace
22  in the hope that their program will ultimately reduce expense to the consumer and the industry
23  while increasing and assuring part quality."  In fact, Defendants' obtaining of CAPA certification
24  facilitated the maintenance of the illegal price-fixing scheme described herein, as it created
25  further barriers to entry and limited competition.  Defendants Depo, Eagle Eyes, and TYC are all
26  participating manufacturers in the CAPA certification program.

27      35.    By way of background regarding quality certification, an Illinois class action
28  against the State Farm Insurance Company, commenced in 1997, had a dramatic effect on the

-9-

COMPLAINT

1    market for aftermarket automotive parts. In that case, the plaintiffs accused State Farm, the
2    largest automobile insurer in the United States, of breaching its contracts with policyholders
3    when it specified the use of non-original equipment parts in the repair of vehicles damaged in
4    crashes. In 1999, a jury awarded $456 million to the plaintiffs, and the presiding judge awarded
5    an additional $730 million, including $600 million in punitive damages. In the wake of these
6    combined awards in excess of $1 billion, the North American market for aftermarket parts
7    dropped by about 40% in 2000, resulting in challenging times for almost all Taiwan aftermarket
8    parts suppliers during the following two to three years. In 2005, the Illinois Supreme Court
9    eventually reversed all awards made against State Farm, and in 2006, the United States Supreme
10   Court declined to hear Plaintiff's appeal.

11       36.    Following the United States Supreme Court's decision to not hear on appeal in the
12   State Farm case, the State Farm's expected decision to once again utilize aftermarket parts,
13   Taiwan news reports in 2006 quoted local aftermarket parts makers as predicting a return to sales
14   levels even higher than in 1999.

15       37.    The impact of the State Farm case had begun to soften in 2002, as a group of
16   United States auto insurance firms (not including State Farm) resumed the use of aftermarket
17   parts. By mid 2006, the aftermarket parts market recovered to, or even exceeded, the pre-1999
18   levels.

19       38.    The State Farm case jump started a move by Taiwanese aftermarket parts makers
20   in 2000 to join quality-control organizations such as CAPA, and to actively increase the number
21   of their CAPA-approved items available to the auto-insurance market. Several years later, CAPA
22   decided to add a quality certification program for lighting products.

23       39.    Defendant Genera, the exclusive U.S. distributor for defendant TYC states on its
24   website the following regarding CAPA certification:

25

26       CAPA created standards for the objective evaluation and certification of sheet
27       metal, bumper, and other automotive collision replacement parts.

28

-10-

1  Because exterior lighting products represent about one-quarter of the total cost of
2  replacement parts used in collision repair, CAPA has developed a quality
3  certification program for lighting products. In September, 2005, TYC, through
4  extensive collaboration with CAPA, became the first manufacturer to achieve
5  CAPA certification of lighting parts.

7  CAPA certified TYC lighting products are of OE-comparable form (appearance),
8  fit (installation), and function (performance), are highly regarded as a viable
9  alternative quality part, and are quickly gaining awareness and enthusiastic
10  acceptance by collision repairers.

12  Approximately 7 out of 10 national auto insurance companies prescribe CAPA
13  parts, many of whom are prescribing CAPA certified lamps. TYC's CAPA
14  certified lamps create repair opportunities that previously did not exist by driving
15  more business to repairers and substantially reducing the percentage of vehicles
16  declared total-loss in a collision repair estimate.

18  TYC offers the broadest CAPA certified lighting products in the market and is
19  consistently developing popular applications, with internal testing labs that
20  accelerate release timing of new items. Our aggressive production inventory
21  planning ensures the highest fill rate and ability to meet growing demand via our
22  five strategically located distribution centers through the U.S.

24  40. Depo also joined CAPA certification in 2005, and by the end of that year, Depo
25  owned 18 CAPA certified lamp sets, and TYC owned 3. TYC planned to own 150 to 2000
26  certified lamp sets by the end of 2006. A Taiwanese new account in 2006 noted that CAPA's
27  decision was expected to increase the confidence of policyholders in the use of AM parts to
28  repair their vehicles, gradually squeeze low-quality parts from the market, improve the quality of

-11-

COMPLAINT

1  certified parts, and enhance the profit margins of manufacturers in Taiwan.

2  41.  In 2006, Michael Hu, Depo's sales manager, was quoted as stating that "[t] sale of
3  AM auto lamps in the U.S. was growing steadily even before the CAPA decision to provide
4  certification for automotive lighting products.  Now, we see even greater growth momentum
5  ahead.  The more lamp models that are certified, the stronger the growth momentum will be
6  because insurance companies will have more choices of parts."  Mr. Hu went on to contrast the
7  more competitive European market with the less-competitive U.S. market as follows:  "[In
8  Europe], competition for Taiwanese suppliers is much fiercer than it is in the U.S. because all OE
9  auto-lamp suppliers there also supply the original equipment service (OES) market where
10  replacement parts are distributed under the brand names of the automakers themselves and
11  through their own maintenance networks."

12  42.  Also in 2006, TYC's director of aftermarket and OEM sales, Carlos Ting, was
13  quoted as stating that "CAPA certification will bring a better market in North America for
14  quality-oriented auto-lamp suppliers like TYC because poor quality products have destroyed the
15  *market order* there in the past few years." (Emphasis added)

16  43.  In 2006, TYC's manager of North American sales, Orian Chang, was quoted as
17  stating that "CAPA certification is a challenge for all auto-lamp makers because it requires even
18  higher levels of quality and safety than is required for OEM items.  CAPA approval will create
19  lucrative business opportunities for the companies that can qualify."  Not surprisingly, TYC's
20  global sales grew by 10% to 20% in the first half of 2006, depending on market area, and Mr.
21  Ting attributed the substantial sales growth in part to TYC's increasing number of CAPA
22  certified products.

23  44.  American insurance companies also promoted the Manufacturers' Qualification
24  and Validation Program ("MQVP") for the certification of the quality and safety of non-OEM
25  parts.  The program outlined policies and quality-management practices designed to ensure that
26  repair parts are equal to original parts in form, function, and durability.  In 2003, it was reported
27  that defendant TYC claimed to have the highest ratio of MQVP-certified products among all the
28  world's auto-parts makers.  In 2003, for example, Nationwide Mutual Insurance Co. the sixth

-12-

1    largest insurer is the U.S. approved the use of TYC aftermarket lamps as replacement parts

2    following the certification of those lamps by the MQVP, and Taiwan Economic News reported

3    that other major American insurers, including Allstate and USAA, were expected to follow suit.

4        45.    It was also reported in 2003 that another development that encouraged the use of

5    non-OE parts in the differential-premium system offered by insurance companies in the U.S.,

6    allowing policyholders to opt for lower premiums if they accepted the use of non-OEM parts to

7    repair their insured cars.

8    **The Culture of Cooperation Among Taiwanese AALP**

9        46.    As Taiwan Economic News noted in 2003, Taiwan has an unmatched advantage

10    of well-established industry cluster in the southern part of the island, and had become the biggest

11    and most important production base for aftermarket auto parts in the world. Raymond Wu,

12    president of Ton Yang, analyzed the Taiwanese aftermarket parts manufacturers as follows:

13

14    Now the world's strongest AM auto-parts production citadel, according to Wu,

15    Taiwan comes close to monopolizing the global MA parts market and is largely

16    able to escape any negative impact from foreign-exchange fluctuations because

17    almost all major makers is the AM sector are from Taiwan and thus their

18    quotation bases move in tandem, providing strong pricing power.

19

20    Wu points out that most local makers of AM auto parts in southern Taiwan's

21    industry cluster have similar backgrounds. Their founding personnel were

22    previously with traditional makers in the auto section. They were focused on

23    export sales right from the early years. They gradually expanded production scale

24    with increased global demand, constantly upgrading their production techniques

25    and finished-product quality, constantly upgrading their production techniques

26    and finished-product quality, constantly accelerating and strengthening their

27    product-development capabilities, and have also become engaged in OE parts

28    supply to international automakers after gaining a solid foothold in the AM

-13-

market. After about 30 years of strenuous efforts, Wu says, many small companies in and around the southern Taiwan city of Tainan have grown to become major international OE/AM parts supplies.

According to Wu, the Taiwan auto-parts industry's global competitiveness lies mainly in makers' one-stop shop service capability, which has been put in place as a result of intensive investments in mold/die development and new-product development, high-level management and quality control, and a deep cluster of makers of items in wide variety.

Taiwan's AM-parts industry is also now implementing a more sophisticated international marketing strategy, moving away from exclusive reliance on low prices to attract customers. In the past, Wu explains, most local AM-parts makers competed with one another by cutting prices no matter how strong the global demand was, to "steal" market share from each other, but now the situation has changed, makers have abandoned this approach, and the profit margins of major local AM-parts makers parallel or even outstrip those of high-tech product makers on the island.

One of the best examples of Taiwan Kai Yih Industrial Co., Ltd., an affiliate of Ton Yang and one of the island's major AM sheet-metal body parts makers. Kai Yih is a relative newcomer among major counterparts in Taiwan but the company skillfully utilizes Tong Yang Group's resources and advantages in mold/die development and closely cooperates with local counterparts to escape the blood-shedding price competition, thus achieving very high profitability, Wu explains.

In addition to Tong Yang, other globally famous companies in the line clustered in and about Tainan include Ta Yih Industrial Co. (the largest OE auto-lamp

-14-

COMPLAINT

1    manufacturer among local automakers, accounting for over 80% of the domestic

2    market) and its affiliate.  TYC Brothers Industrial Co., Ltd. (one of the world's

3    largest auto-lamp makers), Taiwan Kai Yih Industrial Co., Ltd (Tong Yang's

4    affiliate and a leading supplier of sheet-metal body parts maker), and Macauto

5    Industrial Co., Ltd. (a leading maker of in-car sunshade products).

7    The Tong Yang Group is one of the best examples—and one of the creators—of

8    the Taiwan auto-parts industry cluster.  Tong Yang started over 50 years ago by

9    concentrating on the plastic-injection parts-production business.  After various

10   transformations undertaken in the early stages, the group decided to concentrate

11   on transportation vehicle-relevant parts production and constantly evolved from a

12   maker of plastic bicycle parts, motorcycle windshields to plastic auto "crash

13   parts"—replacement parts for use after collisions as bumpers, grills, mirrors, etc.

14   Now, Tong Yang is one of the largest auto parts conglomerates in Taiwan and

15   also a leading supplier of both OE an AM auto parts in the international market.

16   47.    Another 2003 article in the Taiwan Economic News described an anticompetitive

17   market division arrangement between the Ta Yih Group (which includes TYC) and Ton Yang:

18   Wu Jun-yi, chairman of Ta Yih Group, was with Tong Yang earlier in his

19   career before he stepped out of the group to set up one of the island's first

20   motorcycle and auto-lamp factories.  *With close ties with Tong Yang, Wu Jun-ji*

21   *insists that all of the affiliates in the Ta Yih Group only produce items that Tong*

22   *Yang does not, to escape destructive in-group competition.    With this tacit*

23   *understanding between Ta Yih and Tong Yang,* Wu Jun-ji says, the two groups

24   cooperate closely in joint market development by sharing marketing expenses and

25   together offering a more comprehensive product line (emphasis added).

26   48.    The ties between Defendants, as well as Ta Yih Industrial Co., Ltd., the OEM

27   lighting manufacturer that is another member of the Ta Yih Group along with Defendant TYC,

28   are strong.  For example, Taiwan Economic News reported that a "cooperative arrangement, the

-15-

1   Advanced Auto-lamp System R&D Alliance (ALS), was formed in 2004 to upgrade the global

2   competitiveness of the island's auto lamps by focusing on the original-equipment (OE) business,"

3   and its 11 members were listed as including Ta Yih Industry, TYC, and Depo, Taiwan's top-three

4   auto-lamps makers.  Depo also notes on its website that it has a "cooperation culture."

## IX.   DEFENDANTS' ANTITRUST VIOLATIONS

6         49.       Defendants are horizontal competitors at the manufacturing and distributors levels,

7   respectively, and collectively conspired to fix the prices of and artificially manipulate the market

8   for the importation, sale and distribution throughout the United States of AALP.  Each of the

9   distributor Defendants is the exclusive distributor of AALP made by a specific defendant

10  manufacturer located in Taiwan.  Defendant Genera is wholly or partially owned by and is the

11  exclusive importer and seller of the lighting products made by defendant TYC; Defendant

12  Maxzone is wholly or partially owned by and is the exclusive importer and seller of the lighting

13  products of defendant Depo; and defendant E-Lite is wholly or partially owned by and is the

14  exclusive importer and seller of the lighting products of defendant Eagle Eyes.

15        50.       AALP is highly tangible because purchasers decide, and competitors compete,

16  largely based on price.  There are no substitutable products for AALP.  Price fixing and market

17  allocation are particularly pernicious within a highly concentrated, fungible market for which

18  adequate substitutes do not exist, as is the case here.  Genera's website features a "TYC Part

19  Interchange," in which users can input "Part Interchange Query" by selecting an "OEM Number

20  or Competitor Number" and receiving information about an equivalent part from a competitor,

21  thereby demonstrating the fungibility of the products.

22        51.       Beginning at least as early as January 1, 2004 and continuing up to the present,

23  Defendants and their co-conspirators combined and conspired to unreasonably restrain

24  competition in interstate commerce in the importation, sale and distribution of AALP in the

25  United States, in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

26        52.       The purpose and effect of Defendants' price fixing conspiracy has been to

27  eliminate competition among and between themselves and to eliminate customer choice by,

28  establishing artificially high and noncompetitive prices for AALP in the United States.  This

-16-

1  price fixing agreement constitutes a per se violation of Section 1 of the Sherman Act (15 U.S.C.

2  §1) in that it eliminates true competition, customer choice and serves no legitimate purpose.

3       53.    From at least January 1, 2004 through the present, Defendants have engaged in

4  extensive price fixing of AALP. Defendants' unlawful conspiracy had the effect of, among other

5  things, raising prices of those products and eliminating competitors from the market, thereby

6  further restraining trade in the importation, distribution and sale of aftermarket automotive lights

7  throughout the United States.

8       54.    The Defendants also employed anticompetitive tactics to eliminate distributors

9  who refused to participate in Defendants' price fixing scheme and others who posed a

10  competitive threat. The effect of Defendants' anticompetitive conduct has been to reduce the

11  number of competitors selling the relevant products to Plaintiff and the Class.

12      55.    According to a former distributor for defendant Eagle Eyes who was present at

13  Defendants' meeting, Defendants met and conspired to fix prices of AALP on a number of

14  occasions since 2004. That former distributor identified by name the executives and managers

15  from the Defendants who participated in meetings with their horizontal competitors to fix prices.

16  That former distributor also identified the locations where the price fixing meetings took place.

17      56.    Starting at least as early as 2004, the representatives of the Defendant

18  manufacturers met in Taiwan to fix the prices at which each Defendant manufacturer would sell

19  to its Defendant distributors and then the United States Defendant distributors of these Taiwanese

20  Defendant manufacturers separately met, including at the offices of Defendant Genera in La

21  Palma, California and at the Automotive Aftermarket Products Expo ("AAPEX"), an industry

22  trade show in Las Vegas, Nevada, to conspire to fix prices of AALP. Defendants met at the

23  AAPEX, in November of 2004, November of 2005, October of 2006, and October of 2007, in

24  furtherance of their anticompetitive conspiracy.

25      57.    Defendants also facilitated their conspiracy through using international trade

26  shows as convenient forums to conspire. One such example is the International Auto Parts &

27  Accessories Show, the most recent of which was held in Taipei over four days in April of 2008.

28      58.    Defendants agreed to fix the prices at which they would sell to their respective

-17-

COMPLAINT

1  customers.  At the Defendant distributor meetings, there was open discussion of the Defendant

2  manufactures' meetings in Taiwan and the priced reaches at those meetings.  The Defendant

3  manufacturers' meetings in Taiwan were attended by the following Defendants through their

4  representatives indicated below:

5

6  TYC  Chun-Chi Wu, Chairman/General Manager

7  Depo  Shiu-Min Hsu, Chairman and Jui-Jua Lai, General Manager

8  Eagle Eyes  Yu-Chu Lin, Chairman, Ching Tsung Lai, General Manager and

9  Homy Hsu, Vice President

10

11  59.  Since 2007, the Defendant distributors' meetings in California and Nevada were

12  attended by the following Defendants through the representatives indicated below:

13

14  E-Lite  George Lee, President, Shih Chi (Gary) Lin (Eagle Eyes' owners' son)

15  Genera  Drue Hsia, President and Jackson Kwock, Executive Vice President

16  Maxzone  Polo Shu Sheng Hsu, President and Galen Chen, Director of

17  Sales and Marketing

18

19  60.  At meetings between employees of Defendant E-Lite, Genera and Maxzone, and

20  possibly others, said employees represented that their United States resale prices were fixed by

21  their respective Defendants manufacturers and were graduated (not precisely equal) so as to

22  reflect the market share or consumer preferences for brand.  Accordingly, the prices set for

23  Genera, perceived to be the premier aftermarket product, were 2-3% higher than for Depo and, in

24  turn, Depo's prices were 5-7% higher than Eagle Eyes.

25  61.  In December 2003, just before the onset of the conspiracy period alleged herein,

26  Defendant TYC reported pretax earnings of US $19.3 million for the first 11 months of 2003,

27  down 24% from the same period in 2002. Taiwan Economic News reported that TYC attributed

28  the decreased 2003 profits to, among other things, the fact that "some local auto lamp makers

-18-

1 were engaged in fierce price cutting competition with the firm in overseas markets, which also
2 undermined [the] company's profitability."

3     62.    The price-cutting competition in "overseas markets" and in particular, the U.S.
4 market, would be remedied by Defendants' adherence to the collusive price-fixing conspiracy
5 alleged herein. Its effect were immediate and substantial. On August 13, 2004, Taiwan
6 Economic News reported that defendant TYC had July 2004 revenue of US $17.43 million, up
7 13.4% from the same month in 2003, and its seven-month revenue reached US $114.94 million,
8 up 2.5% from the same period of the prior year. Both figures were record highs. Taiwan
9 Economic News reported that "TYC attributed the brilliant operation results" to "price hikes for
10 its products," among other things.

11     63.    Depo too enjoyed the results of collusion. Baring Private Equity Partners Asia
12 ("Baring Asia"), owner of a stake in Depo, noted in 2004 that Depo was the most profitable auto
13 parts company in Taiwan, generating over US $150 million in sales, with US $29 million of net
14 profit. Baring Asia further noted that "Depo has a dominant market position in an industry which
15 is experiencing strong demand in the US and Europe." Jean Eric Salata, Managing Partner of
16 Barin Asia, was quoted with respect to Depo as stating that "[t]his is a solid company with very
17 high entry barriers."

18     64.    Defendant Eagle Eyes too has benefited from its role in the conspiracy. The
19 company is based in Tainan, as is TYC, and the collusive business culture pervading the
20 aftermarket auto parts manufactures in that region as described earlier in this Complaint. The
21 Taipei Times reported in 2007 that Eagle Eyes was selected by the China Credit Information
22 Service as a prime example of Taiwan's booming businesses, and reported annual revenues of
23 more than US $24.4 million.

24     65.    The effects of Defendants' collusive scheme continue to this day. In April of
25 2008, representatives of Defendants TYC and Depo attended the four-day 2008 International
26 Auto Parts and Accessories Show in Taipei, and the Taipei Times reported that both companies
27 commented at the event on very substantial price increases as follows:

28

-19-

1

2      "DEPO has gradually maintained its prices between 10 percent and 15 percent

3      since the first quarter of this year," said Tony Wang, section chief of Depos'

4      Middle East Africa area, on the sidelines of the 2008 International Auto Parts and

5      Accessories Show (AMPA) in Taipei.   Another major automotive lighting

6      equipment manufacturer, TYC Brother Industrial Co., agreed.  Eldon Li, assistant

7      general manager of TYC's aftermarket sales department, said the company would

8      have to increase 10 percent of its sales to cover the rising costs of raw materials,

9      primarily cardboards and plastics.

10

11     Defendants' statements also are notable in that they sought to attribute on a perpetual

12  basis the entirety of their price increases solely to rising material costs, i.e. cardboard and plastic

13  costs; transportation costs related to rises in crude oil prices; and currency fluctuations, while

14  failing to disclose the impact of the illegal conspiracy on prices.

15                          **X.     CLASS ACTION ALLEGATIONS**

16     66.      Plaintiff brings this action on behalf of itself and as a Class action under the

17  provisions of Rule 23(a) and (b) (2) and (b) (3) of the Federal Rules of Civil Procedure on behalf

18  of the following Class:

19      All persons and entities in the United States, and its territories and possessions,

20      who purchased AALP directly from a Defendant between at least as early as

21      January 1, 2004 and the present.  This class excludes any judicial officer who is

22      assigned to hear any aspect of this action, governmental entities, defendants, co-

23      conspirators, and the present and former parents, predecessors, subsidiaries and

24      affiliates of the foregoing.

25

26     67.      Plaintiff believes that there are least hundreds of Class members as above

27  described, the exact number and their identities being known by Defendants, making the Class so

28  numerous and geographically dispersed that joinder of all members is impracticable.

-20-

COMPLAINT

1

2      68.    There are questions of law and fact common to the Class, which questions relate

3   to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as

4   a result thereof, including, but not limited to:

5          a.    Whether Defendants and their co-conspirators engaged in a combination and

6                conspiracy among themselves to fix, raise, maintain and/or stabilize prices of

7                AALP and/or engaged in market allocation for those products sold in the United

8                States, and its territories and possessions.

9          b.    The identity of the participants in the conspiracy;

10         c.    The duration of the conspiracy alleged in this Complaint and the nature and

11               character of the acts performed by Defendants and their co-conspirators in

12               furtherance on the conspiracy;

13         d.    Whether the alleged conspiracy violated Section 1 of the Sherman Act;

14         e.    Whether the conduct of Defendants and their co-conspirators, as alleged in this

15               Complaint, caused injury to the business and property of plaintiff and other

16               members of the Class;

17         f.    The effect of Defendants' conspiracy on the prices of AALP sold in the United

18               States and its territories and possessions during the class period; and

19         g.    The appropriate measure of damages sustained by Plaintiff and other members of

20               the Class.

21     69.    Plaintiff is a direct purchaser of AALP and its interests are coincident with and not

22   antagonistic to those of the other members of the Class.  Plaintiff is a member of the Class, has

23   claims that are typical of the claims of the Class members, and will fairly and adequately protect

24   the interests of the class members.   In addition, plaintiff is represented by counsel who are

25   competent and experienced in the prosecution of antitrust and class action litigation.

26     70.    The prosecution of separate actions by individual members of the Class would

27   create a risk of inconsistent or varying adjudications.

28     71.    Defendants have acted, and refused to act, on grounds generally applicable to the

-21-

1  Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

2        72.    The questions of law and fact common to the class members predominate over any
3  questions affecting only individual members, including legal and factual issues relating to
4  liability and damages.

5        73.    A class action is superior to other available methods for the fair and efficient
6  adjudication of this controversy. Treatment as a class action will permit a large number of
7  similarly situated persons to adjudicate their common claims in a single forum simultaneously,
8  efficiently and without duplication of effort and expense that numerous individual actions would
9  engender. The Class is readily definable and is one for which records should exist in the files of
10  Defendants and their co-conspirators, and prosecution of as a class action will eliminate the
11  possibility of repetitious litigation. Class treatment will also permit the adjudication of relatively
12  small claims by many Class members who otherwise could not afford to litigate an antitrust claim
13  such as is asserted in this Complaint. This class action presents no difficulties of management
14  that would preclude its maintenance as a class action.

15        **XI.    EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT**

16        74.    Throughout the class period, Defendants and their co-conspirators affirmatively
17  and fraudulently concealed their unlawful conduct.

18        75.    Neither Defendants nor their co-conspirators told Plaintiff or other Class members
19  that they were fixing prices or allocating markets. Accordingly, Plaintiff and Class members
20  could not have discovered the violations alleged herein earlier until shortly before the filing of
21  this Complaint because Defendants and their co-conspirators conducted their conspiracy secretly,
22  concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently
23  concealed their activities through various other means and methods designed to avoid detection.

24        76.    Defendants and their co-conspirators engaged in a successful price-fixing
25  conspiracy, which they affirmatively concealed, at least in the following respects by, *inter alia*:
26  (a) meeting secretly to discuss prices, customers and markets of AALP sold in the United States
27  and elsewhere; (b) using methods of communication in furtherance of the alleged conspiracy that
28  were designed to avoid detection; (c) giving pretextual reasons for price increases on AALP, as in

-22-

1    the April 2008 example noted above; and (d) agreeing among themselves at meeting and in
2    communications not to discuss publicly, or otherwise reveal, the nature and substance of the acts
3    and communications in furtherance of their illegal scheme.

4    77.    As a result of Defendants and their co-conspirators' fraudulent concealment, all
5    applicable statutes of limitations affecting the Plaintiffs' and the Class's claims have tolled.
6    Plaintiff and the Class members did not discover, nor could have discovered through reasonable
7    diligence, that Defendants and their co-conspirators were violating the antitrust laws until
8    September 2008, when a lawsuit was filed by a distributor that revealed details of Defendants'
9    unlawful and collusive scheme.    Plaintiff could not have discovered the existence of the
10   combination and conspiracy alleged herein at an earlier date by the exercise of reasonable due
11   diligence because of the deceptive practices and techniques of secrecy employed by the
12   Defendants and their co-conspirators to avoid detection and affirmatively conceal such violations.

13   78.    Because the contract, combination, or conspiracy was kept secret by the
14   Defendants, Plaintiff was unaware of the fact that prices of AALP were secretly raised, fixed,
15   maintained or stabilized as alleged herein.

16   79.    As a result of the fraudulent concealment of the conspiracy, plaintiff asserts the
17   tolling of the applicable statute of limitations affecting the causes of action by plaintiff and the
18   class members.

19                            **XII.    CAUSES OF ACTION**

20                **Violation of Section 1 of the Sherman Act – 15 U.S.C. § 1**

21   80.    Plaintiff incorporated and re-alleges each allegation set forth in the preceding
22   paragraphs of this Complaint.

23   81.    Beginning at least as early as January 1, 2004, and continuing thereafter,
24   Defendants and their co-conspirators, by and through their officers, directors, employees, agents,
25   or other representatives, entered into a continuing agreement, understanding, and conspiracy in
26   restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for AALP in the United
27   States, and its territories and possessions, in violation of Section 1 of the Sherman Act (15 U.S.C.
28   § 1).

-23-

1    82.    The contract, combination and conspiracy consisted of a continuing agreement,

2    understanding and concert of action among the Defendants and their co-conspirators, the

3    substantial terms of which were to fix, raise and maintain, or stabilize prices for AALP and/or

4    engage in market allocation for those services in the United States, its territories and possessions.

5    83.    In formulating and effectuating the contract, combination or conspiracy,

6    Defendants and their co-conspirators did those things that they unlawfully combined and

7    conspired and conspired.

8              a.   agreeing to charge prices at certain levels and otherwise to fix, increase,

9                   maintain and/or stabilize prices of AALP and/or allocate the market;

10             b.   exchanging information on prices and sales volumes;

11             c.   implementing and monitoring the conspiracy among cartel members;

12             d.   marketing AALP as being available at the agreed upon prices; and

13             e.   selling AALP at the agreed upon prices.

14   84.    The activities described above have been engaged in by Defendants and their co-

15   conspirators for the purpose of effectuating the unlawful agreements to fix, maintain, raise and/or

16   stabilize prices of AALP and/or allocating the market for those products.

17   85.    The conspiracy had its intended effect, as Defendants benefited from their

18   collusively-set price raises, including in 2008, as described herein.

19   86.    Defendants' unlawful conduct resulted in artificially high prices charged by

20   defendants and their co-conspirators to Plaintiff and the class members for AALP.

21   87.    Plaintiff and members of the Class had to pay more for AALP than they would

22   have paid in a competitive marketplace.

23   88.    Plaintiff seeks to recover for these overcharge damages.

24   89.    As a direct and proximate result of Defendants' scheme, plaintiff and the class

25   members have been injured and financially damaged in their respective businesses and property,

26   in amounts which are presently undetermined. Plaintiff's injuries consist of paying higher prices

27   to purchase AALP than he would have paid absent Defendants' conduct. Plaintiff's injuries are

28   of the type of antitrust laws were designed to prevent and flow from that which makes

-24-

1  Defendants' conduct unlawful.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray as follows:

A.    That the Count determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators, be found to have been in violation of Section 1 of the Sherman Act (15 U.S.C. § 1);

C.    That judgment be entered for plaintiff and members of the Class against Defendants for three times the amount of damages sustained by Plaintiff and the Class as allowed by law, together with the costs of this action, including reasonable attorneys' fees;

D.    That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in and manner:

(1)    continuing, maintaining or renewing the contract, combination or conspiracy alleged herein, or from engaging in any other contract, combination or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, programs or device having a similar purpose or effect, and

(2)    communicating or causing to be communicated to any other person engaged in the manufacture, distribution or sale of any product except to the extent necessary in connection with a bona fide sales transaction between the parties to such communications.

E.    That Plaintiff and members of the Class have such other, further and different relief as the case may require and the Court may deem just and proper under the circumstances, and

Providing for other legal and/or equitable relief as is permitted at law and as justice requires.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury

-25-

1 | trial as to all issues so triable.

2

3 | Date: July 23, 2009                    Respectfully submitted,

4

5

6 | By: _Reginald Terrell_____
   |     DONALD AMAMGBO, ESQ.
   |     AMAMGBO & ASSOCIATES
7

8 |     7901 Oakport Street, Suite 4900
   |     Oakland, California 94621
9 |     Telephone: (510) 615-6000
   |     Facsimile: (510) 615-6025
10

11 |     REGINALD TERRELL, ESQ.
    |     THE TERRELL LAW GROUP
    |     Post Office Box 13315, PMB #148
12 |     Oakland, California 94661
    |     Telephone: (510) 237-9700
13 |     Facsimile: (510) 237-4616

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28